# KELLEY J. SHARKEY

Attorney at Law                                           26 Court Street - Suite 2805
                                                          Brooklyn, New York  11242
                                                          Tel:  (718) 858-8843
                                                          Fax: (718) 875-0053

                                                          September 1, 2010

*BY FAX*

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201


Dear Judge Cogan:

    I write on behalf of my client, Orlando Spado, to request that the Court be as merciful as possible and sentence Mr. Spado to a minimal below Guideline sentence that is no greater than necessary to comply with the sentencing directives of 18 U.S.C.§3553(a).

I. ADVISORY GUIDELINE COMPUTATIONS

    On July 20, 2010 the defendant and the United States Attorney's office entered into a plea agreement detailing the following Guideline calculation:

Count 8 - Hobbs Act Robbery

| | |
|---|---|
| Base offense level (§2B3.1(a)) - | 20 |
| Managerial Role (§3B1.1( c )) - | +2 |
| Acceptance of Responsibility/ Timeliness §3E1.1(a) and (b) - | -3 |
| Total - | 19 |

Count 9 - Use of a Firearm in a Crime of Violence

>    Minimum term of imprisonment:    5 years to run consecutively to sentence imposed on Count 8 (18U.S.C. 924(c)(1)( C )(I))
>
>    Maximum term of imprisonment:    Life (18 U.S.C. 924 ( c )(1)( C )(I)

Because Mr. Spado falls into Criminal History Category I, the effective Guideline Range for Count 8 is 30 to 37 months. Combined with the mandatory consecutive 60 months required for a conviction of Count 9 (18 U.S.C. 924 (c)(1) (C)(I)) the defendants Guidelines Range is 90 - 97 months imprisonment.

Probation calculates the defendant's base offense level at 28, enhancing the base offense calculated by the prosecution by 4 points pursuant to U.S.S.G. §2B3.1(b)(7)(E)(defendants intent to steal $1,000,000.00 in narcotics proceeds) and an additional 2 level pursuant to USSG.§2B3.1(b)(4)(B) (attempted robbery involved the restraint of one of victims.) Respectfully, a review of the trial transcript concerning the attempted robbery and the calculation provided by the Government, contradict these enhancements and the defense respectfully requests that the Court reject Probation's enhanced  calculation.

II. PERSONAL HISTORY

Orlando Spado is a 65-year old army veteran in failing health. Born in Rome New York in 1944, Orlando Spado is the father of three adult children who remain close and supportive of him.

Spado was raised in a working class Italian-American family in Rome New York as one of the six children of Olivia and Joseph Spado.  His father was employed as a  factory worker at Revere Copper and Brass and continued to work there until shortly before his death from the complications of diabetes and heart disease at the age of 62.  Spado's last regular schooling was high school at Rome Free Academy which he left on the eve of graduation in 1963 in order to join the army.

Spado's Vietnam-era military service was served in Oahu Hawaii. Where he worked in administrative positions and took a number of business-related classes at the University of Hawaii but was unable to complete a degree. In 1966, shortly after his honorable discharge from the army at the rank of E-4 Specialist in the field of artillery he was called back to upstate New York to help care for his ill father until his death in 1969, an experience that remains with him to this day.

During this time, 1966-1971 Spado worked a number of factory jobs and took business and computer related courses. He married his first wife, Antoinette Juliano in 1967, eventually he had 3 children by this marriage (Gina 1969) (Orlando 1975) (Anthony 1977). Spado began a successful career in the insurance industry working for several agencies including the Prudential Insurance Agency. Prudential transferred Spado briefly to San Francisco in 1971 but he returned to the Utica area after a year and continued to work in the insurance industry. At one point he attained membership in the "Million Dollar Round Table" of high producers in insurance sales in the Utica area and eventually opened his own agency, the Ori Agency. However, the agency eventually failed along with his marriage and he returned to San Francisco, to another area of sales with the Asian Yellow Pages around 1979.

Shortly thereafter he entered a short-lived marriage to his second wife Rosemary Atkin. Spado had no children with his second wife and has completely lost contact with her. He remains a single man, but remains close with his first wife and their three children as well as his 6 grandchildren. Gina has 3 children and is a school teacher living in Frankfort, New York. Orlando has 3 children and owns a swimming pool company in the Miami area. Anthony shared an apartment in Los Angeles with his father until the time of his arrest on the instant offense 2 years ago and is in the entertainment business.

Building upon his success with the Asian Yellow pages, the defendant subsequently moved to the Los Angeles Area in the mid-eighties. He first worked managing the Better Business Bureau Yellow pages and then undertook a number of largely unsuccessful business ventures. In 1989 he started the American Check Guarantee Company which he ran until 1991. He again changed careers to the entertainment business where he enjoyed moderate success and remained gainfully employed up until his arrest.

Among his many accomplishments in the entertainment field, during the period 1991 to 2006, he provided all major exhibits and booked entertainment for the Queen Mary, a Southern California tourist landmark, including displays of artifacts from the Titantic, Bob Marley, Marilyn Monroe and the Treasures of Russia. In addition he managed local screen writers, as well as singers and producers from England and was affiliated with British Film Producer John Daly for a time. In 1997 he formed a Nevada corporation called Capital Growth Systems to encompass his entertainment consulting work.

Mr. Spado was arrested in June 2008 in his home in Los Angeles and has been held in pretrial detention at the MDC for the past 2 years, separated from friends and family and suffering from a number of serious health issues detailed at length in the Probation report and discussed more fully below. He has remained in close and frequent contact with his family and friends by any means at his disposal and they remain acutely concerned about his well being as evidenced by their various letters to the Court. He has had no disciplinary infractions of any kind during his incarceration.

III.     THE CRIME OF CONVICTION

Orlando Spado was indicted and charged with Racketeering Conspiracy, Robbery Conspiracy, Use of a Firearm, and Cocaine Conspiracy. He entered a plea of not guilty and stood ready to proceed

to trial. On the eve of jury selection Mr. Spado's case was severed from his co-defendants. At the conclusion of co-defendant's trial, Mr. Spado again readied himself to proceed to trial. It was at this juncture that the prosecution and defense counsel arrived at a mutually acceptable plea agreement charging Spado with the Hobbs Act Robbery and Use of a Firearm. Spado plead guilty to those charges and takes full responsibility for his actions as they pertain to him.

Notably, Spado did not plead guilty to the Racketeering Conspiracy or the Cocaine Conspiracy. Counsel notes that while those allegations are addressed at length in the Presentence Report prepared by the Department of Probation, those allegations were never confronted as they pertain to Spado.

A review of the trial transcript, as it pertains to Spado's crimes of conviction, reveal that many of the taped conversations defendant had intended to introduce at trial in his defense were not fully aired for the Court or the jury. While this was expected given that the severance granted by the Court was prompted by concerns that the introduction of those tapes would result in prejudice to the codefendant(s) some are never-the-less relevant to your Honor in determining the defendant's criminal conduct when sentencing in this matter.

For instance as to the Hobbs Act Robbery, a relevant discussion between cooperating witness Guy Fatato and Colombo Captain Michael Catapano on the eve of the robbery (May 18, 2006) can be found on recording #74 (DX#72). An excerpt of this discussion was initially designated as Government Trial Exhibit 207 and is reproduced in relevant part below:

> FATATO: So, **so we're going down there**, Ori introduced the drug dealer down there (UI). His wife, he's black. You know, a black guy, white woman. His wife comes too. (UI) open combination (UI). So she sold the Hummer and, and the car so she had money to live. (UI) kid's in jail. Just got locked up. (UI) the house, they were suin' him. Three hundred thousand per million. That's it. Took out a big loan. So uh, I said but you kids are leavin' today? **I got the DEA uniform. Packed 'em up. You know,**

5

**the jackets**?

CATAPANO: Yeah. Yeah.

FATATO: (UI) **search warrant**

CATAPANO: Oh, okay.

FATATO: (UI) What do you want me to do? I says I'm playin' with my money. Tell Larry [sic] to shut his fuckin' mouth, whatever's in there. Say there's three hundred in there, borrowed [sic] fifty, you keep fifty and Nick gets fifty. We're splitting it down the middle. You guys take care of what you can handle.

FATATO: (UI) tomorrow. Because I'm honest (UI) with that color you got. I said I know. (UI) that and then tell Larry [sic] I'll see him (UI) 'cause I'm flyin' down there.

CATAPANO: Yeah. And you know what? You're just tryin' to tell him there was a hundred and fifty in there, we're splitting it.

FATATO: Okay.

CATAPANO: And then the rest comes back in.

FATATO: Yeah.

CATAPANO: That's all.

FATATO: Yeah, whatever's in it, but, you know, a lot of people say there's X, ...

CATAPANO: (UI)

FATATO: ... X amount of dollar in there?

CATAPANO: Yeah. I mean uh, yeah.

FATATO: Then it's less. You know. get fifty, they get fifty.
If it's a hundred, then we Ya know?

CATAPANO: Yeah, meanwhile they fuckin' (UI).

FATATO: Exactly. (UI) No, but this guy was a big roller, from what I heard. So uh, they're leaving today, they're coming back Sunday. So, hopefully, you know, they definitely will try to do the right thing.

6

CATAPANO: (UI)

FATATO: Exactly.

CATAPANO: How they gonna, how they gonna get it in?

FATATO: I said let's just, just, just get it, then I told 'em, get it, stay in the hotel you're staying at, take it back, get another hotel. (UI) me about them.

CATAPANO: (UI)

FATATO: Stay in another hotel.

CATAPANO: Gotta let him know where he's staying.

FATATO: That's, that's what I said. Exactly.

CATAPANO: Now I know where to stay.

FATATO: (UI)Just go over there.

CATAPANO: (UI)

FATATO: (UI)

FATATO: That number I got, (UI). **Just tell me what's goin' on and I'll tell you exactly what to do**.

CATAPANO: Sure.

FATATO: (UI)

CATAPANO: (UI)

CATAPANO: **Hopefully, they'll come back with a nice little score.**

FATATO: Yeah.

Proposed Government Trial Exhibit 207T at 2-4. (emphasis added).

This discussion calls into question who was responsible for the organization of the

robbery (Fatato or Spado?) and the accuracy of Neza's estimation of the amount of money thought to be in the safe, raising that possibility that Spado himself may have contemplated a much smaller sum of money, and was at least unsure about the sum. This is underscored by Catapano's final statement: "Hopefully, they'll come back with a nice little score." There was no testimony adduced from Mr. Neza at trial, as to the source of the 1 million dollar figure that has been used as the basis of a substantial 4 point enhancement by probation. We respectfully urge that the court resolve this ambiguity in favor of Mr. Spado.

On August 9, 2006, as recounted in FBI 302 dated August 14, 2006 and Bates Stamped # 0201 Cooperating witness Guy Fatato and Colombo Crime Family Captain Michael Catapano discuss Catapano's desire to kill Spado, as authorized by Sonny Franzese for his failure to provide them with any money. A full listening of the bodywire recordings (which were extensively excerpted in our motion in support of severance) indicates that Catapano and Fatato are fed up with the fact that Spado has not concluded any drug exchange, had not provided the family with any money and Catapano dismisses him as a "fucking windbag." See Fatato bodywire recording #86 for 8/9/2006 produced as DX 84 at 1:07:43.

Although we have no desire to wade back into the mire of bodywires from this case, one of the unavoidable conclusions from listening to many many hours of them is that virtually all of the participants in the conspiracy were not telling each other the whole truth at all times. It is reasonable to believe that Nick Neza, the junior member of the team, at the age of 19, may not have been privy to key details of the plan and that perhaps that there was more than one "windbag" in the group.

IV.   ORLANDO SPADO ASKS THE COURT TO IMPLEMENT THE SENTENCING GOALS OF 18 U.S.C. 3553(a).

Apart from consideration of departures under the now "advisory" Guidelines, 18 U.S.C. §3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." Section 3553(a)(2) states that such purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the sentencing court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense.

Other statutory sections also give the district court direction in sentencing. Under Title 18 U.S.C. §3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, a sentencing judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."

Under 18 U.S.C. §3661, "[n]o limitation shall be placed on the information concerning the background, character or conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an

appropriate sentence."

Indeed, the directives of United States v. Booker, 593 U.S. 220 (2005), United States v. Crosby, 397 F.3d 103 (2<sup>d</sup> Cir. 2005) and §3553(a) now make clear that courts must consider all of the factors in §3553(a), many of which the Guidelines either reject or ignore. For example, under §3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." Under the Guidelines, however, courts are generally forbidden to consider the defendant's age, U.S.S.G. §5H1.1, his education and vocational skills, §5H1.3, his physical condition, §5H1.4, his employment record, § 5H1.5, his family ties and responsibilities, § 5H1.6, his socio-economic status, §5H1.10, his civic and military contributions. The Guideline's prohibition of considering these factors cannot be squared with the §3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. See Simon v. United States, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005). Additionally, in some cases, the Guidelines will clash with §3553(a)'s primary directive: "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

In sum, under Booker and Crosby, the Guidelines are not binding and courts need no longer justify a sentence outside of them by citing factors to take the case outside the "heartland". Courts are now free to disagree, in individual cases and in the exercise of discretion, with the actual Guidelines range, so long as the ultimate sentence imposed is reasonable and supported by reasons tied to the § 3553(a) factors.

An analysis of the § 3553(a) factors in this case, I think, militates in favor of Orlando Spado and the imposition of a non-guidelines sentence.

          A.      THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

While mindful of the serious nature of Orlando Spado's crime of conviction, the defense believes that a Guideline sentence is not appropriate for this defendant under this specific set of circumstances.

Mr. Spado admits his wrong doing and accepts responsibility for his actions. He deeply regrets his actions and understands that he will be appropriately punished for his behavior. Under the circumstances presented in this case he should be sentenced below the Guideline range.

B.    THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The defense would like to incorporate by reference the Personal History Section of this letter. Orlando Spado is chronically ill and suffers from congestive heart failure, high blood pressure, diabetes, difficulty breathing (cardiac asthma), an enlarged prostrate and other conditions detailed in the Probation report at p. 18. To date, the management of his multiple and life threatening illnesses by the Bureau of Prisons, has been abysmal. This Court has sought to intervene on the defendant's behalf on numerous occasions. Despite the Court's best efforts, Mr. Spado is still in need of further treatment for his congestive heart failure. More, he has repeatedly experienced blackouts, spells of dizziness, difficulty breathing and an inability to sleep because of his prostrate condition.

In short, he can't sleep, he can't breath without difficulty, he can't urinate without discomfort or pain, and he is frequently plagued by chest pains and dizziness. The Bureau of Prisons has often ignored Mr. Spado's requests for medical treatment and at other times has failed to follow up physicians orders. For example ignoring a medical  direction that further sent procedures be scheduled.

C.    THE KINDS OF SENTENCE AVAILABLE

For Count 8: the range of imprisonment is 0 - 20 years; the maximum term of supervised release is 3 years; the maximum fine is the greater of $250,000, twice the pecuniary gain or twice the pecuniary loss.

For Count 9: the range of imprisonment is 5-life; the maximum term of supervised release is 5 years; the maximum fine is $250,000 and the sentence imposed on this count must run consecutively to the sentence imposed on count 8.

### D. THE GUIDELINES SENTENCING RANGE AND GUIDELINES POLICY STATEMENT

The Supreme Court's decision in Booker/Fantan and the cases interpreting that ruling require sentencing courts to treat the Guidelines as one of a number of sentencing factors set forth in 18 U.S.C.§3553(a). As the Supreme Court held, the now revised Sentencing Reform Act (SRA) "requires a sentencing court to consider Guideline ranges, see 28 U.S.C.A.§3553(a)(4) ( Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well,"Booker, 125 S. Ct. at 757.

Under the now "advisory" Guidelines, the sentencing court is not bound by the formerly applicable departure rules when it bases its decision to impose a non-Guidelines sentence on the other SRA factors. Thus, in determining an appropriate sentence in this case, the imposition of a Guidelines sentence gives too great weight to the Guidelines calculus and too little weight to the other factors noted herein.

### IV. REFLECTING THE SERIOUSNESS OF THE OFFENSE, PROMOTING RESPECT FOR THE LAW, PROVIDING JUST PUNISHMENT, DETERRING CRIMINAL CONDUCT, PROTECTING THE PUBLIC

Title 18 U.S.C.§3553(a) requires courts to impose a sentence "sufficient, but not greater than

necessary" to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training. All of these sentencing objectives can be attained by imposing a non-Guidelines sentence.

## CONCLUSION

It is clear that this Court may tailor the sentence in light of all the statutory concerns embodied by 18 U.S.C.§3553(a). As noted by Judge Hellerstein in <u>United States v. Carvajal</u>, 2005 WL 476125 (E.D.N.Y. Feb. 22, 2005) "rehabilitation is a ...goal of punishment...That goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are created in the image of God. A judge should be hesitant before sentencing so severely that he destroys and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of sentencing." Orlando Spado apologizes to the Court for his criminal behavior. He asks this Court to fashion a sentence that provides him with medical care at Terminal Island in the Central District of California near to his family and loved ones, is lenient, and in accord with the directives of 18 U.S.C.§3553.

Respectfully yours,

KELLEY J. SHARKEY

cc: United States Attorney
    Eastern District of New York
    Attn: Cristina Posa and Rachel Nash, Esqs.